**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:20-cv-00125 |
| | ) | |
| | ) | |
| NEW ASPEN MANAGEMENT LLC, d/b/a | ) | |
| GVA MANAGEMENT TN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AND PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS**
Local Rule 56.01(b)

---

1.     Plaintiff was hired as a Community Manager at New Aspen's Madison, TN location (referred to as "Meadowbrook") by Diana English ("Ms. English"). Both Plaintiff and Ms. English are female.

      **Evidence**: *Am. Compl.* ¶¶ 11, 13; **Exhibit A** – Plaintiff's Deposition Transcript ("Plaintiff Tr."), at p. 18:1-4; **Exhibit B** - Diana English Deposition Transcript ("English Tr."), at p. 34:7-10.

**RESPONSE: Admit.**

2.     One of Plaintiff's job duties was to walk units, which, in part, consisted of approaching apartment units to collect unpaid rent, to ascertain whether the unit was vacant, to unlock doors to units for contractors remodeling and lock afterwards to assess progress, and to assess damage to units when tenants moved out.

      **Evidence**: *Am. Compl.* ¶ 16.

**RESPONSE**: **Admit.**

1

3.    On February 12, 2019, Plaintiff was sexually assaulted (including rape) by one to two unknown assailants while she was walking units in performing the duties of her job.

**Evidence**: Plaintiff Tr., Ex. A, at p. 28:2-5; *Am. Compl.* ¶¶ 23, 24; English Tr., Ex. B., at p. 62:21-24.

**RESPONSE: Admit.**

4.    Plaintiff initially stated to her husband, Ms. English, and those treating her in the hospital that she was not raped, but, approximately a month and a half later, informed Ms. English, her husband, and the police that she was raped.

**Evidence**: English Tr., Ex. B, at p. 56:5-25; Plaintiff Tr., Ex. A, at pp. 35:6-19, 40:9-11, and 57:9-17.

**RESPONSE: Admit. Although English suspected that Doe had been raped. (English Dep. 56-57, 59).**

5.    New Aspen was unaware that Plaintiff was raped prior to March 18, 2019.

**Evidence**: Plaintiff Tr., Ex. A, at p. 57:9-17.

**RESPONSE**: **Denied. English suspected that Doe had been raped and informed Garst, Bazicki, and Cotton that she suspected there was more to the story, but neither Cotton nor Garst recalled English informing them of her suspicions. (English Dep. 56-57, 59; Cotton Dep. 6, 12; Garst Dep. 26).**

6.    Plaintiff returned to work at Meadowbrook approximately two (2) days following the assault voluntarily because she did not want the assailants "to win," and New Aspen provided an armed security guard on-site at Meadowbrook to accompany Plaintiff while on location.

**Evidence**: *Am. Compl.* ¶ 29; Plaintiff Tr., Ex. A, at p. 37:13-14; English Tr., Ex. B, at pp. 49:6-10 and 50:17-19; **Exhibit C** – Deposition of Kara Garst ("Garst Tr."), at p. 31:5-15; **Exhibit D** – Deposition of Dr. Cynthia Lucas ("Lucas Tr."), at pp. 17:2-5 and 17:23-18:2; **Exhibit E** – Plaintiff's Psychiatric Expert Report – Dr. B. Charles Ihrig, at p. 12; **Exhibit F** – Plaintiff's Medical Records – Dr. Lucas; and **Exhibit G** – Deposition of Amanda Stillwell ("Stillwell Tr."), at pp. 42:21-43:10.

**RESPONSE: Denied. Doe returned to work only one or two days after the assault, English never informed her that she could take any time off and instead said that Doe needed to get back to work because English had other things to do, but English would check in on her and there would be a security guard. (Doe Dep. 37). To avoid issues with the corporate office, English told Doe to text her that she is fine. (Doe Dep. 38). Doe needed her job and felt she had no choice but to come back. (Doe Dep. 38). Neither Cotton nor Garst recalled any conversations about providing Doe any workers comp leave, paid time off or placing Doe off work to allow time to heal. (Cotton Dep. 33; Garst Dep. 26, 28, 31).**

7.  Plaintiff filed a workers' compensation claim against New Aspen and received

    treatment for the injuries resulting from the rape.

    **Evidence**: *Am. Compl.* ⁋ 97; Ex. F – Plaintiff Medical Records – Dr. Lucas.

**RESPONSE: Admit in part, Denied in part. Doe did not file a worker's compensation claim, GVA did. The worker's compensation carrier only became aware of Doe's rape in September 2019, after it was noted in her counselor's notes. (MSJ Ex. 7 p. 000054). Thus, any paid treatment was for the initial battery involving the knife.**

8.  New Aspen assisted Plaintiff in obtaining mental health treatment following the assault.

    **Evidence**: **Exhibit H** – Deposition of Elaine Cotton ("Cotton Tr."), at p. 20:6-11.

**RESPONSE: Admit.**

9.  Upon returning to work at the Meadowbrook location, Plaintiff asked not to walk units

    alone, and New Aspen hired an armed security guard to accompany Plaintiff

    everywhere she went on New Aspen's premises and another security guard to live on-

    site at Meadowbrook.

    **Evidence**: Plaintiff Tr., Ex. A, at pp. 70:8-18; English Tr., Ex. B, at p. 50:17-19.

**RESPONSE: Denied. GVA did not hire a security guard to work at Meadowbrook until after Doe's assault, and even then, the guard was temporary.[1] (English Dep 50:17–51:10; Stillwell Dep. 9; MSJ Ex. 2 p. 000001-000005; MSJ Ex. 2 p. 000001-000005). Although English said that Doe was not supposed to work on the property or exit her office without the security guard GVA hired, English admits that the security guard only worked at the GVA property for a couple of months. (English Dep. 50–51). Further, the security guard was not available**

---

[1] Garst testified that GVA hired a security guard prior to Doe's assault, but there was no evidentiary support for her recollection. (Garst Dep. 21).

3

all the time, and if he was not available and Doe had to walk a unit, she had to walk it alone. (Doe Dep. 71). Further, GVA did not continue to provide security for Doe at the Clarksville location, and she was still required to walk units. (English Dep. 71; Towery Decl. ¶ 11). Despite Doe's request for accommodation to not walk units, and Frazier stating he would see what could be done, GVA still required Doe walk units, with or without a security Guard. (Doe Dep. 59, Frazier Dep. Ex. 15-16).

10.     Plaintiff eventually determined she no longer wished to walk units at all at the

Meadowbrook location.  Plaintiff was permitted to not walk units.

**Evidence**: English Tr., Ex. B, at pp. 66:24-67:14, 72:1-15.

**RESPONSE**: **Denied. Despite Doe's request for accommodation to not walk units, and Mr. Frazier stating he would see what could be done, GVA still required Doe walk units, with or without a security Guard. (Doe Dep. 59, Frazier Dep. Ex. 15-16).**

11.     Plaintiff then determined she could no longer work at the Meadowbrook location.  Ms.

English allowed Plaintiff to work from home beginning May 23, 2019 while a new job

with New Aspen was identified or created for Plaintiff.

**Evidence**: English Tr., Ex. B, at pp. 66:24-67:14, 72:1-15, 71:24-72:24, **Exhibit T -**

[Initials Redacted[2]]00056-57.

**RESPONSE**: **Denied. Garst testified that she and English made plans to move Doe to another location after Doe received the envelope with the necklace and bullet casing, English testified that it was at Doe's request she is transferred from the Meadowbrook location. (Garst Dep. 27, 33; English Dep. 67, Ex. 7 p. 0056; MSJ Ex. 4). Further, during this time, Doe began seeing Dr. Lucas in May 2019, through Worker's Compensation. (Lucas Dep. Ex. P. 000152). Dr. Lucas made various requests for accommodations on Doe's behalf, including asking the company to stop forcing Doe to walk units, especially at the Meadowbrook facility. (Doe Dep. 59; Lucas Dep. 56–57). As a result of her May 22 session, per Dr. Lucas, Doe requested from English an accommodation to take off May 22-29. (Doe Dep. 68; Lucas Dep. Ex. 1 p. 000051; MSJ Ex. 7). While English testified that Doe and she went to Chattanooga together, English instead required Doe to cover the GVA location in Chattanooga in English's stead. (Doe Dep. 68-69; English Dep. 69, Ex. 7 p. 0056; Lucas Dep. Ex 1 p. 000049-000050). Again, English requested Doe send her a text with inaccurate information, this time stating she is ok to go to Chattanooga and it was ok that English did not go with her. (Doe Dep. 69-70).**

---

[2] Plaintiff's identifying information is redacted pursuant to Dkt. No. 13

4

12.    New Aspen created an Assistant Community Manager position at the Clarksville, Tennessee location at the same rate of pay, same flexible schedule, a location much closer to Plaintiff's home, closer to the location at which her husband worked, and with the same benefits as the position Plaintiff held at Meadowbrook. Plaintiff was paid each time she was off the property for treatment for her injuries resulting from the sexual assault. Plaintiff's economic expert did not assign any monetary damages to this transfer to the Clarksville office and noted that Plaintiff's rate of pay was the same.

**Evidence**: English Tr., Ex. B, at pp. 67:2-68:19, 78:17-79:13, **Exhibit I -** Deposition of Alicia Foster ("Foster Tr."), at p. 11:4-13; **Exhibit M** – Plaintiff's Economic Expert Report – Charles L. Baum, **Exhibit O** – Communication between Ms. Foster and Plaintiff [Redacted]00923-1065, E**xhibit P** – Communication between Plaintiff and Diana English, at [Redacted]00586-776.

**RESPONSE**: **Denied. Once transferred, in June 2019 after she requested her accommodation, Doe was demoted from property manager to assistant property manager, her pay changed from salary to hourly and as a result she no longer received commissions. (Doe Dep. 40-42, 68; English Dep. 67; Lucas Dep. Ex. 1 p. 000051).**

13.    After accepting the Assistant Community Manager position at the Clarksville, Tennessee location and beginning work at that location on May 29, 2019, Plaintiff indicated she no longer could walk units at that location either, and then was not required to do so. Plaintiff's request to not walk units was accommodated. If Plaintiff walked units after that point, it was her choice to do so.

**Evidence**: Foster Tr., Ex. I, at pp. 12:2-13:2; Lucas Tr., Ex. D, at pp. 56:24-58:14 and 110:1-22; and **Exhibit U** – Communication Regarding Plaintiff's Request to Transfer from Meadowbrook, at [Redacted]00207.

**RESPONSE**: **Denied. GVA did not continue to provide security for Doe at the Clarksville location, and she was still required to walk units. (English Dep. 71; Towery Decl. ¶ 11). Despite Doe's request for accommodation to not walk units, and Mr. Frazier stating he would see what could be done, GVA still required Doe walk units, with or without a security Guard. (Doe Dep. 59, Frazier Dep. Ex. 15-16).**

5

14. Plaintiff went on leave to care for her newly-adopted son on July 26, 2019.

   **Evidence**: **Exhibit N** – Communication Regarding Plaintiff's Leave, at [Redacted]0204.

**RESPONSE: Admit.**

15. Diana English's last day of employment with New Aspen was January 1, 2020.

   **Evidence**: **Exhibit Q** - English Separation Form.

**RESPONSE**: **Admit.**

16. Plaintiff resigned her employment with New Aspen on February 20, 2020 because she accepted an offer of employment with HCA.

   **Evidence**: Plaintiff Tr., Ex. A, at pp. 84:23-85:2; **Exhibit R** – Plaintiff's Resignation Letter.

**RESPONSE**: **Admit [however the letter is dated 2/28/20].**

17. New Aspen has a policy prohibiting harassment and discrimination on the basis of gender and includes the identity of the person to whom employees may report inappropriate conduct.

   **Evidence**: **Exhibit J** – New Aspen Handbook.

**RESPONSE**: **Admit. However, the identity of the person to whom employees may report inappropriate conduct to is their direct supervisor or the Regional Supervisor. ((MSJ Ex. 1, p. 00345). In this case, English was Doe's harasser, her direct supervisor, and Regional Supervisor. Doe reported directly to Diana English, the Regional Property Supervisor. (Doe Dep. 18; English Dep. 8-9).**

18. Plaintiff received the policy prohibiting sexual harassment and discrimination and acknowledged she received and reviewed it.

   **Evidence**: **Exhibit K** – Plaintiff's Handbook Acknowledgement.

6

**RESPONSE**: **Admit; however, the acknowledgement cited is dated 2/10/20, mere days before Plaintiff resigned).**

19.     Plaintiff did not complain to New Aspen's Human Resources about sexual harassment.

    <u>Evidence</u>: Plaintiff Tr., Ex. A, at p. 48:13-17.

**RESPONSE: Denied. Defendant mischaracterizes Doe's deposition and the nature of its "human resources" department. To be sure, there was no "human resources department" until after Kara Garst left around October 31, 2019. (Cotton Dep. 7-9; Garst Dep. 6). In the cited portion, Doe states she disclosed the sexual harassment of English to New Aspen's Chaplain, specifically English sharing the photos of her wounds to Brown. However, Doe also testified, after warning English, Doe reported to Garst about English discussing her rape with fellow employees, including telling them that Doe should have kicked and screamed and should have fought harder. (Doe Dep. 52; Garst Dep. 42; Lucas Dep. Ex. 1 p. 000047; MSJ Ex. 5 p. 000048). English also told Doe over the phone that she should have fought harder. (Doe Dep. 91) Doe communicated to Garst that there was a lot she wanted to say but she was afraid of losing her job. (Doe Dep. 52). Garst told her she would contact Bazicki who deals with Tennessee problems. (Doe Dep. 52). While Garst stated that what English said should never have been said, GVA did not investigate Doe's allegations. (Doe Dep 52, Garst 44-45, 47-48). Further, Garst testified that she is "not a fan of hearsay" and likely changed the topic or dismissed Doe because she is not rude to people but hates gossip; further, she would not "entertain it" and she likely did not look into it, despite Doe being upset. (Garst Dep. 44-45, 47-48). In fact, towards the end of Doe's complaint Garst was ready to go and testified that she probably changed the conversation back to Doe's baby. (Garst Dep. 46).**
    **Garst then told Doe to contact Bazicki. (Doe Dep. 52). Doe contacted Bazicki and informed her what English said about kicking and screaming and fighting harder, only to be told, "let's just let it go." (Doe Dep. 53-54, 67).**

20.     Plaintiff's treating physician, Dr. Cynthia Lucas, determined Plaintiff could choose

    whether she walked units or not.

    <u>Evidence</u>: Lucas Tr., Ex. D, at pp. 56:24-58:14 and 110:1-22; Ex. F – Plaintiff's Medical Records – Dr. Lucas.

**RESPONSE**: **Admit. Dr. Lucas later amended Doe's work restrictions because Doe was told that she needed to walk units as part of her job, and she believed if she did not walk the units, she would lose her job. (Lucas Dep. 57-58).**

21.     Plaintiff was diagnosed with PTSD and Depression at an undisclosed time years ago,

    and then again, as a result of prior trauma (being abducted and forced to withdraw

    money from the ATM), and again following being raped while working.

7

**Evidence**: Plaintiff Tr., Ex. A, at pp. 77:2-78:16; Plaintiff's Psychiatric Expert Report, at Ex. E.

**RESPONSE: Admit. However, Doe was in "remission, full remission, from that." (Lucas Dep. 62).**

22.     Plaintiff's treating physician never restricted her from walking units—it was always

Plaintiff's choice whether she did so or not.

**Evidence**: Ex. F – Plaintiff's Medical Records – Dr. Lucas.

**RESPONSE: Denied. While Dr. Lucas explicitly set work restrictions for Doe that stated, "She will determine . . . when/if she can enter units" as she should have "agency over working through that trauma." (Cotton Dep. Ex. 14 p. 0010, 0012-0013; Lucas Dep 106, Ex. 1 p. 000029; *see also* 000030 – 000034 ,000035, 000039, 000040,000098) Dr. Lucas set the specific work restrictions related to walking units because Dr. Lucas determined that walking units triggered PTSD symptoms related to Doe's attack, including an anxiety response. (Lucas Dep. 56–57, 60). Dr. Lucas later amended Doe's work restrictions because Doe was told that she needed to walk units as part of her job, and she believed if she did not walk the units, she would lose her job. (Lucas Dep. 57-58).**
**It was not Doe's choice whether she did or not as despite Doe's request for accommodation to not walk units, and Mr. Frazier stating he would see what could be done, GVA still required Doe walk units, with or without a security Guard. (Doe Dep. 59, Frazier Dep. Ex. 15-16).**

23.     New Aspen assisted in paying for Plaintiff's adoption of her son in early June of 2019

and provided Plaintiff with paid leave in July of 2019 that it was not required to by law

or company policy following Plaintiff's transfer to the Clarksville, Tennessee location,

following Plaintiff's request to discontinue walking units, well-following Plaintiff

sharing she had been raped, and following filing her workers' compensation claim.

**Evidence**: Plaintiff Tr., Ex. A, at p. 66:7-13; **Exhibit L** – Communication Regarding Payment for Plaintiff's Adoption, at [Redacted]00163-164 and 00241.

**RESPONSE: Admit to the extent that New Aspen assisted in paying for Doe's adoption of her son in early July of 2019 and she was provided paid leave in July 2019. However, despite Doe's request for accommodation to not walk units, and Mr. Frazier stating he would see what could be done, GVA still required Doe walk units, with or without a security Guard. (Doe Dep. 59, Frazier Dep. Ex. 15-16). In fact, when she returned from maternity leave, despite her repeated requests to not walk units, which English denies, there**

8

**were delinquent accounts, no one had filed any evictions, 20 units had not been walked. (Doe Dep. 72, 82; English Dep. 73; Lucas Dep. Ex. 1 p. 000041; MSJ Ex. 7). GVA required Doe to walk these units despite both her requests for accommodations and Dr. Lucas's restrictions. (Doe Dep. 73-74; English Dep. 80; Lucas Dep. Ex. 1 p. 000035; MSJ Ex. 7). Doe was also required to collect delinquencies requiring her to go to apartments and talk to renters, despite informing English that she was having post-traumatic stress and going to the properties gave her flashbacks and she was uncomfortable even if someone was with her. (English Dep. 74; Lucas Dep. Ex. 1 p. 000048; MSJ Ex. 7). English made Doe believe she should be "over it by now." (Lucas Dep. Ex. 1 p. 000048).**

24. Plaintiff filed an EEOC Charge against New Aspen on February 7, 2020.

    **Evidence**: **Exhibit S** – Plaintiff's EEOC Charge, at [Redacted]00014.

**RESPONSE: Admit.**

9

## Plaintiff's Additional Statement of Facts

1.       GVA employees typically walked units alone. (Stillwell Dep. 14; Towery Decl. ¶11).

**RESPONSE:**

2.       There was no written policy, communication or safety protocol for walking units. (English Dep. 16-21; Towery Decl. ¶ 10).

**RESPONSE:**

3.       English relied on property managers' prior experience in the industry to give managers the safety skills necessary to do the job. (English Dep. 20). Doe was "kind of thrown in there" with little to no training given that English's "training" of new managers lasted approximately one and half minutes and only consisted of discussing "standard rules." (Doe Dep. 18-19; English Dep. 20-21; Stillwell Dep. 9).

**RESPONSE:**

4.       During the January/February 2019 timeframe, Doe was not able to have another person walk units with her at Meadowbrook because only one other person worked there, a maintenance employee, who also worked at other properties. (English Dep 23–24; Doe Dep. 18, 62).

**RESPONSE:**

5.       Amanda Stillwell, a GVA employee who filled in at Meadowbrook, also walked Meadowbrook alone, even at night; she was not provided with any information or training related to property safety, nor told that she should not walk units alone, and she was not provided security. (Stillwell Dep. 13-14).

10

**RESPONSE:**

6.      GVA's manual recognizes that sexual harassment can include behavior from a "non-team member." (MSJ Ex. 1 p. 00344).

**RESPONSE:**

7.      Doe was not aware of the criminal activity when she was hired, but GVA management was aware of the significant criminal activity that took place at Meadowbrook. (English Dep. 27, 88; Garst Dep. 13-14).

**RESPONSE:**

8.      English's knowledge of Meadowbrook's violent criminal activity was based on seeing police reports and news stories about the criminal activity, and her active tracking of the criminal activity near Meadowbrook using a crime reporting app on her phone. (English Dep 28, Ex. 1 p. 0318-0320, Ex. 2 p. 00572-00573; MSJ Ex. 6 p. 000100-101; 000108).

**RESPONSE:**

9.      Despite knowledge of the dangers, GVA did not disseminate any information about crimes occurring around Meadowbrook to Doe or other GVA employees. (English Dep. 30; Doe Dep. 21; Stillwell Dep. 14, 25).

**RESPONSE:**

10.     In the three months leading up to Doe's assault, law enforcement received approximately fifty-one (51) calls to the Meadowbrook location including calls for burglary, domestic disturbance, suspicious persons, assault, and rape (not including Doe's rape). (Doe Dep. 105, Ex. 2 p. 000034-000037; English Dep. Ex. 2 p. 00573; MSJ Ex. 8 pp. 1-2).

**RESPONSE:**

11.     Shortly before Doe's assault, in late January 2019, the Metro Nashville Police

Department (MNPD) notified GVA that a resident at Meadowbrook had been violently sexually assaulted, that other violent crimes, including a drive-by shooting had occurred. (English Dep. 32-33, 84–86, Ex.1 p. 0320; Doe Dep. 21, 23; MSJ Ex. 8 pp. 420-444, 481-498).

**RESPONSE:**

12.     In response to the sexual assault of a resident, English directed Doe to issue 3-day eviction notices to those residents. (English Dep. 33-34; Doe Dep. 25). After Doe issued the notices, the resident came to the leasing office and made threats to her in front of English. (Doe Dep. 25). This eviction was ultimately rescinded since it violated the Women's Domestic Violence Act. (Doe Dep. 25; English Dep. Ex. 3 p. 0271, Ex. 4 p. 0066).

**RESPONSE:**

13.     GVA only hired a security guard at Meadowbrook temporarily after Doe was assaulted. (English Dep. 50-51; Stillwell Dep. 9; MSJ Ex. 2 p. 0001-0005).

**RESPONSE:**

14.     While English said that Doe was not supposed to work on the property or exit her office without the security guard GVA hired, English admitted that the security guard only worked at the GVA property for a couple of months. (English Dep. 50-51). Further, the security guard was not available all the time, and in those instances, Doe had to walk units alone. (Doe Dep. 71).

**RESPONSE:**

15.     Doe was taken to the hospital where English took pictures of the cuts on her face and neck and GVA corporate employees were notified. (Doe Dep. 36; English Dep. 44, 46-47, Ex. 5 pp. 0315-0317; Cotton Dep. 27, Ex. 11 p. 0135; Garst Dep. 20). English provided conflicting testimony about who she showed the pictures to. (English Dep. 48, 95, Ex. 5 p. 0315-0317).

**RESPONSE:**

16.     English told Cotton that Doe would return to work the next day. (Cotton Dep. Ex. 11 p. 0135).

**RESPONSE:**

17.     At some point, English also took a picture of the Doe's blood on the wall in the unit. (English Dep. 45, Ex. 5 p. 0317).

**RESPONSE:**

18.     Doe returned to work only one or two days after the assault, because English never informed her that she could take any time off and instead said that Doe needed to get back to work because English had other things to do, but English stated there would be a security guard. (Doe Dep. 37). Doe needed her job and felt she had no choice but to come back. (Doe Dep. 38). There were no conversations about providing Doe workers' comp leave, paid time off or placing Doe off work to allow time to heal. (Cotton Dep. 33; Garst Dep. 26, 28, 31; Doe Dep. 37-39). To the contrary, the incident reports GVA filed the day after the assault stated Doe would return to work on February 14. (Cotton Dep. 12, 21, 50, Ex. 9; *see* Ex. 10; English Dep. Ex. 1).

**RESPONSE:**

19.     Cotton never spoke to Doe directly regarding the details of the assault and could not recall where she received the return to work date. (Cotton Dep. 19, Ex. 9 p. 0084, Ex. 10 p. 0245).

**RESPONSE:**

20.     A week after the assault, Doe received an envelope in the dropbox at Meadowbrook's office that contained a bullet casing and the necklace she was wearing the day she was assaulted. (Doe Dep. 64; English Dep. 52; MSJ Ex. 4). Doe notified English, her husband, and the police about the threat. (English Dep. 52; Doe Dep. 65; MSJ Ex. 8 pp. 500-502). English

13

notified GVA corporate management about the threat, but no incident report was created. (English Dep. 54, Ex. 6; Garst Dep. 32). English gossiped about the threat to Stillwell. (Stillwell Dep. 33).

**RESPONSE:**

21.     The day after the assault, Clarksville employee, Nikki Towery told Doe that English sent the photos she took of Doe's injuries to Manager Ashley Brown, who began showing them to multiple employees. (Doe Dep. 45-46, 96; Stillwell Dep. 19-20; English Dep. Ex. 5 p. 0315-0317; Towery Decl. ¶¶5-6). Doe was made aware that other employees had seen the same photos from English. (Doe Dep. 44-45). Doe's husband was also made aware of the practice. (Doe Dep. 47).

**RESPONSE:**

22.     Doe requested to no longer walk units. (English Dep. 74; Frazier Dep. 40-41; Doe Dep. 39). However, a few weeks after the assault, Doe was forced to walk the unit she was assaulted and raped with English and the security guard; her blood from her attack was still on the wall. (Doe Dep. 38, 88-89; Lucas Dep. Ex. 1 p. 000047). In fact, she had to go to that unit several more times after the assault. (Doe Dep. 39).

**RESPONSE:**

23.     Around February 20, Doe requested assistance from GVA in finding a counselor/therapist to process the assault and sleep issues she started experiencing. (English Dep. Ex. 6 p. 0079; Frazier Dep. 33; Cotton Dep. Ex. 12 p. 0183).

**RESPONSE:**

24.     Cotton never received an updated incident report to indicate Doe was sexually assaulted, and consequently, did not update GVA's worker's compensation carrier. (Cotton Dep. 6, 12). The carrier became aware of Doe's rape in September 2019, after it was noted in her counselor's notes. (MSJ Ex. 7 p. 000054). This was the first worker's compensation incident

14

involving a mental injury Cotton had ever handled. (Cotton Dep. 42). Cotton could not recall requiring Doe to provide a return-to-work release despite GVA's policy that if an employee is physically injured, they are required to provide a return-to-work release from their doctor. (Cotton Dep. 43, 51-52).

**RESPONSE:**

25.     English began gossiping to other employees about Doe's rape, implying that Doe lied about it. (Stillwell Dep. 15-17, 22, 35-36, 53).

**RESPONSE:**

26.     English openly and frequently questioned Doe's account of the assault, including taking Stillwell to the unit where Doe was raped and said, "don't you think somebody would have heard her screaming or yelling, or if that was you, wouldn't you have screamed or yelled or fought" and "look at it, there's all these cars out here, somebody would have heard something." (Stillwell Dep. 15-17, 22, 28, 35-36, 53; *c.f.* English Dep. 65, 71).

**RESPONSE:**

27.     English repeated her disbelief to Stillwell at least five times, despite being aware that Doe was receiving treatment from a counselor. (Stillwell Dep. 16, 24; English Dep. 66).

**RESPONSE:**

28.     Other employees and residents, became aware of Doe's assault due to GVA's insensitivity and hostility toward Doe. (Stillwell Dep. 18, 21; Towery Decl. ¶8).

**RESPONSE:**

29.     English divulged to Stillwell and other employees that Doe was attending counseling and that her rape came up in the counseling. (Stillwell Dep 41-42).

**RESPONSE:**

15

30.     Other GVA regularly employees talked about Doe, the rape, her counseling sessions and that her rape came up during her sessions. (Stillwell Dep. 29).

**RESPONSE:**

31.     Once transferred, Doe was demoted from property manager to assistant property manager, her pay changed from salary to hourly, and she no longer received commissions. (Doe Dep. 40-42, 68; English Dep. 67; Lucas Dep. Ex. 1 p. 000051). This demotion was not made clear to Doe until after the transfer had been made and she was denied a transfer to a Nashville property that had previously been promised. (Cotton Dep. Ex. 13 p. 0175; Doe Dep. 41).

**RESPONSE:**

32.     GVA did not continue to provide security for Doe at the Clarksville location, and she was still required to walk units. (English Dep. 71; Towery Decl. ¶11). Further, Doe was no longer included in management meetings, and she was left out of conversations that other employees were a part of. (Doe Dep. 63; Towery Decl. ¶14).

**RESPONSE:**

33.     Doe made a request for accommodation to English to work from home after her maternity leave, however English never got back to her and then denied knowledge of the request. (Doe Dep. 83; English Dep. 71).

**RESPONSE:**

34.     After returning to work, despite Doe's repeated requests to not walk units, there were 20 units waiting to be walked, delinquent accounts that had not been followed up on with the residents, and evictions had not been filed. (Doe Dep. 72, 82; English Dep. 73; Lucas Dep. Ex. 1 p. 000041). Despite informing English that she was having post-traumatic stress walking the properties and had made requests for accommodation to not do so, GVA required Doe to walk

16

these units despite Dr. Lucas's restriction that pertained to Meadowbrook. (Doe Dep. 73-74; English Dep. 80; Lucas Dep. Ex. 1 p. 000035; MSJ Ex. 7 p. 0057).

**RESPONSE:**

35.     The requirement that Doe collect delinquencies, which required her to go to apartments and talk to renters, caused her to suffer significant PTSD and depressive symptoms, including flashbacks. (English Dep. 74; Lucas Dep. Ex. 1 p. 000048; MSJ Ex. 7 p. 0048, 50-52).

**RESPONSE:**

36.     English gave Doe the impression she believed Doe should be "over it by now." (Lucas Dep. Ex. 1 p. 000048).

**RESPONSE:**

37.     GVA did not perform any internal investigation into Doe's rape and the dangerous circumstances it knowingly exposes its employees to. (English Dep. 82; Cotton Dep. 62).

**RESPONSE:**

38.     Doe began seeing Dr. Cynthia Lucas in May 2019 for counseling. (Lucas Dep. Ex. 1, p. 000152). Dr. Lucas diagnosed her with Post-Traumatic Stress Disorder and Major Depressive Disorder. (Lucas Dep. 22). Doe suffers from flashbacks, poor sleep, avoidance of sleep, avoidance of activities outside the home, stomach aches, stress, frequent crying, and hypervigilance. (Lucas Dep. 24, 71, 74, Ex. 1 p. 0045, 47). Doe physiologically reacts if she sees a man resembling or smelling like her assaulter, she cannot go anywhere unless she is with her husband, mother, or friend, and if she cannot be with one of them, she has to have them on the phone. (Lucas Dep. 23-24, 52, Ex. 1 p. 0041). Further, the threat that she would be killed if she reported and the fear of retaliation, supported by receipt of the bullet casing and her necklace, caused ongoing trauma. (Lucas Dep. 32; MSJ Ex. 4). To date, Doe continues to experience symptoms and will possibly

have symptoms for the rest of her life. (Lucas Dep. 92-93).

**RESPONSE:**

39.     Dr. Lucas found that Doe's recount of the assault as well as her account of GVA's actions had "always been very consistent with what she reports and what she says, and her physiological reaction, the neurobiological reaction to trauma when she's talking about these things matches up." (Lucas Dep. 30).

**RESPONSE:**

40.     Dr. Lucas found that the impact of the assault was exacerbated by the way she was treated by GVA employees because Doe, like most assault victims, already blamed herself, but by having her supervisor state that Doe did not fight enough and that English would have handled the situation differently, was devasting to Doe. (Lucas Dep. 26-28, Ex. 1 p. 000043). English's comment about how Doe should have screamed or fought was a turning point in Doe's employment. (Lucas Dep. 30).

**RESPONSE:**

41.     Dr. Lucas determined that being required to walk the unit where she was assaulted and seeing her blood on the wall contributed to the hostility she continued to experience. (Lucas Dep. 32).

**RESPONSE:**

42.     English's comments created more damage for Doe because she no longer felt supported, or that she could trust her supervisor and colleagues. (Lucas Dep. 54-55, 73, Ex. 1 p. 000047).

**RESPONSE:**

43.     Walking units was a trigger for Doe as she would experience anxiety anticipating

18

the times notices were given and she would be expected to walk the units. (Lucas Dep. 67).

**RESPONSE:**

44.     Doe made direct, verbal requests for accommodations to supervisors at GVA, including Garst, Bazicki, English, Brown, and Scott Frazier, GVA's in-house chaplain to not go into units. (Doe Dep. 37, 40, 59, 81; Frazier Dep. 17-20, 40-41). Dr. Lucas made various requests for accommodation on Doe's behalf, including asking the company to stop forcing Doe to walk units, especially at the Meadowbrook facility, and time off from work as needed. (Doe Dep. 59; Lucas Dep. 56-57).

**RESPONSE:**

45.     Dr. Lucas explicitly set work restrictions for Doe that stated, "She will determine . . . when/if she can enter units." (Cotton Dep. Ex. 14 p. 0010, 0012-0013; Lucas Dep Ex. 1 p. 000029; *see also* 0030-0035, 0039-0040, 0098). Dr. Lucas set the work restrictions related to walking units because walking units triggered PTSD symptoms related to Doe's attack, including an anxiety response. (Lucas Dep. 56–57, 60).

**RESPONSE:**

46.     As a result of the trauma from the assault, Doe cried often at work, which other employees were aware of. (Doe Dep. 55; Foster Dep. 16; Lucas Dep. Ex. 1 p. 000041; MSJ Ex. 7; Stillwell Dep. 31). English would get frustrated and angry when Doe would cry and English would stop talking to her. (Doe Dep. 55).

**RESPONSE:**

47.     Cotton did not recall engaging in an interactive conversation to determine whether Doe's requests for accommodation could be accommodated and was not involved in any discussions regarding Doe's request to not walk units, despite a worker's compensation note

19

releasing Doe to work except for going to the property where the assault occurred. (Cotton Dep. 48, 53, Ex. 14 p. 0010).

**RESPONSE:**

48.    There were no conversations about Doe's need to take off work for doctor's appointments. (Cotton Dep. 58).

**RESPONSE:**

49.    In early July 2019, Doe complained to Frazier, GVA's chaplain, that English was telling other employees Doe should have kicked and screamed and if the rape had occurred someone would have heard it and that English sent photos of Doe in the hospital to Brown which were shown to other employees. (Doe Dep. 48-49, 66; English Dep. 48, Ex. 5 p. 0315-0317; Frazier Dep. 7, Ex. 15-16). Doe also reported to him that she had a hard time with flashbacks and was very upset when she walked units. (Frazier Ex. 15-16).

**RESPONSE:**

50.    Frazier did not believe he had a formal duty to report harassment by other staff members, as he viewed himself as a "peer" and not management. (Frazier Dep. 50).

**RESPONSE:**

51.    Frazier did speak with Garst and English "generally" about the harmful comments Doe had reported English and others making. (Frazier Dep. 38-40; Stillwell Dep. 29, 48).

**RESPONSE:**

52.    After Doe's complaints to Frazier, English began giving her a harder time and restricted some of her job duties. (Doe Dep. 48, 51).

**RESPONSE:**

53.    Doe also reported her concerns to Garst that English was discussing the assault with

fellow employees, including telling them that Doe should have kicked, screamed and fought harder. (Doe Dep. 52; Garst Dep. 42; Lucas Dep. Ex. 1 p. 000047; MSJ Ex. 5 p. 000048). English also told Doe over the phone that she should have fought harder. (Doe Dep. 91) Doe communicated to Garst that there was a lot she wanted to say but she was afraid of losing her job and Garst deferred to Baziki. (Doe Dep. 52). While Garst stated that what English said should never have been said, GVA did not investigate Doe's allegations. (Doe Dep 52; Garst Dep. 44-45, 47-48).

**RESPONSE:**

54. Garst justified her inaction because she is "not a fan of hearsay" and admitted she likely changed the topic or dismissed Doe because she hates gossip, would not "entertain it," and she likely did not look into it, despite Doe being upset. (Garst Dep. 44-45, 47-48). In fact, towards the end of Doe's complaint, Garst was ready to go and testified that she probably changed the conversation back to Doe's baby. (Garst Dep. 46).

**RESPONSE:**

55. Garst told Doe to contact Bazicki. (Doe Dep. 52). Doe contacted Bazicki and informed her what English said about kicking and screaming and fighting harder, only to be told, "let's just let it go." (Doe Dep. 53-54, 67).

**RESPONSE:**

21

Respectfully submitted,

COLLINS & HUNTER, PLLC

*/s Heather Moore Collins*
Heather Moore Collins (# 026099)
Anne Bennett Hunter (# 022407)
Ashley Shoemaker Walter (# 037651)
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
ashley@collinshunter.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served on July 28, 2021 through the court's CM/ECF system to Heather Gwinn Pabon, Courtney Williams, 3401 Mallory Lane, Suite 120, Franklin, TN 37067, hgwinn@grsm.com, ccwilliams@grsm.com

*s/ Heather Moore Collins*
Heather Moore Collins

22